IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v-

DERREL LEMORN MOORE JR, AKA DERREL AUSTIN

Defendant

---

# DEFENDANT'S OBJECTIONS TO REPORT AND RECOMMENDATION

Indictment No. 24-CR-162-JJM-RJA

Submitted to
Hon. Richard J. Arcara, U.S.D.J.

Respectfully submitted,

Paul M. Michalek, Jr.
Attorney for Defendant
300 Center Road
West Seneca, NY 14224
(716) 675-6715

The Defendant objects to the Magistrate's Report and Recommendation dated October 24, 2025, at Docket Entries # 138 and #139 (hereinafter "R &R"). Pursuant to statute, this Court shall make a de novo determination on the issues in controversy. See 28 U.S.C. § 636(b)(1)(C) ("A judge of the Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."); see also Fed. R. Crim. P. 59(b)(3) ("The district judge must consider de novo any objection to the Magistrate Judge's recommendation."). The Defendant certifies that these objections do not raise new legal/factual arguments.

**BACKGROUND**

On February 17, 2022, at approximately 8:30 p.m., New York State Parole Officers Cathy Scarupa and Tiffany Hertel, along with multiple officers from the Niagara Falls Police Department ("NFPD"), a New York State Trooper and a K-9 Unit arrived at the Defendant's residence (565 7th Street in Niagara Falls, NY) for the purpose of conducting a Gun Involved Violence Elimination ("G.I.V.E.") Operation. Prior to executing the GIVE Operation, Parole Officer Festa had procured Mr. Moore's unique security code from an unknown individual who apparently worked for the building management company without a warrant, without consent, and without any exigent circumstances. Members of New York State Parole subsequently disseminated the Defendant's unique security code to members of NFPD and to the State Trooper Randy Shenefiel.

Once on the scene, NFPD officers surrounded the building creating a "perimeter" designed to prevent entry to or exit from the premises. The parole officers on scene used the code that was seized without a warrant or consent to breach the front door of the premises and gain access to the

interior of the building. Once inside the building, PO Rashad Travis of the Niagara Falls Police Department was notified by NFPD officers stationed at the rear of the building that a "black male" was observed on the rear staircase carrying what appeared to be bags up the stairs and then returning back down without them.

Without being directed by parole, PO Travis on his own initiative, went upstairs to a third-floor apartment and requested entry through another tenant's apartment to access the rear staircase and patio where the bags had been placed. After accessing the rear patio via the third-floor apartment, PO Travis (without instruction nor assistance from parole) recovered three closed bags from the rear patio which he opened without seeking a warrant. He found the three bags to contain drug paraphernalia, what appeared to be controlled substances, and two guns respectively.

After securing the bags in his vehicle, PO Travis re-entered the building and the Defendant opened his apartment door at which time he was ordered out of his apartment into the hallway and placed in handcuffs. NFPD officers and parole then searched Mr. Moore's apartment and took possession of a grey Michael Kors sweatsuit. The parole officers on the scene left the Defendant in the custody of NFPD and left the scene. FBI agent Curtis Middlebrooks arrived on the scene and was present while NFPD officers continued to search Mr. Moore's apartment, and State Trooper Shenefiel conducted a K9 search all without a warrant, without consent, and without an exigent circumstance.

Mr. Moore was transported to the Niagara Falls Police Department where he was charged with felony gun possession. While at the Niagara Falls Police Department, Mr. Moore was taken from the holding cell area to a separate room where he was questioned by FBI Agent Middlebrooks during a conversation that was not contemporaneously memorialized or recorded and that he was assured would remain confidential.

After litigating his case in Niagara County for thirty-two (32) months (up to the morning of jury selection) the state prosecutor withdrew all charges having arranged the filing of federal charges by the Government.

On January 28, 2025, Mr. Moore's *pro se* pretrial motions were filed wherein he moved for dispositive relief, including suppression of evidence seized as a result of the search conducted during the execution of the G.I.V.E. Operation on February 17, 2022. See Dkt. # 37

In his *pro se* pretrial motions, Mr. Moore identified multiple Fourth Amendment violations and raised several issues related to the suppression of evidence, including: (1) the absence of any legitimate articulable reason for Mr. Moore to have been the target of a G.I.V.E. Operation or subjected to a search (2) New York State Parole's unlawful seizure/dissemination of his unique security code and Law enforcement's primary role in the G.I.V.E Operation while using the assistance of New York State Parole to gain entry without a warrant or consent (3) Agent Middlebrooks' written report of his recollection of his conversation with Mr. Moore is also fruit of the poisonous tree and must be suppressed for that reason. Additionally, the conditions and circumstances surrounding Agent Middlebrooks' interview with Mr. Moore were coercive and deceptive in nature such that any statements made were involuntary.

Mr. Moore's pre-trial motions also addressed the following: Motion for Dismissal/Pre-Indictment Delay (Rule 48 (B), Motion for Dismissal of Count 3, Motion for Inspection of Grand Jury Minutes, Motion for Dismissal/Outrageous Government Conduct/Vindictive Prosecution, Application for Costs/Defense Expenditures (DNA Expert), and Motions for Brady Material/Pre-Trial Notices.

**A. Objection to the Magistrate's Failure to Address Mr. Moore's Challenge to Being Placed on the G.I.V.E. List to be Searched.**

Despite extensive testimony and litigation regarding the legality of Mr. Moore's placement on a specific list of parolees to be searched in the absence of probable cause, the Magistrate's R & R completely ignores addressing or making a ruling on the issue. Although Judge McCarthy repeatedly indicated on the record that based on the testimony received, he believed that law enforcement and parole went to Mr. Moore's building on February 17, 2022, with the specific intent to conduct a search related to criminal investigation as opposed to conducting a routine parole check, he failed to address this issue in his Report and Recommendation.

The record and the testimony developed at the suppression hearing for this case do not support the finding of an articulable reason for the Defendant to have been placed on a G.I.V.E. Operation list and targeted to be searched. In fact, the testimony clearly reveals that his placement on the list was completely arbitrary, in that rather than being based on any reliable information, knowledge of specific facts, personal observations or communications, it was based solely on the fact that he participated in activity in 1994 that resulted in a conviction for kidnapping in 1996 (almost 30 years prior to the date of the search).

The testimony from the suppression hearing establishes that Mr. Moore's name was placed on a list to be searched by the G.I.V.E. Operation comprised of multiple officers from the Niagara Falls Police Department, the New York State Police, two parole officers whom he did not know, and a gun sniffing dog. It was conceded that there had been no recent complaints, reports, warnings, or tips alleging that the Defendant was presently involved in criminal activity or in criminal violation of his parole conditions.

While the Defendant has limited Fourth Amendment protections based on his parole status and his agreement to abide by parole conditions which include allowing parole (not police) to

conduct searches of his person or premises, the Supreme Court has made it clear that "no search regime could constitutionally permit 'arbitrary, capricious or harassing' searches of a parolee."

The fact that the Defendant was put on a list and subjected to a search that was conducted by multiple law enforcement agents from various law enforcement agencies based solely on conduct from thirty years prior is the epitome of "arbitrary", "capricious," and "harassing". In her testimony, Parole Officer Scarupa admitted that the Defendant was placed on the G.I.V.E. Operation list to be searched based on his 1996 conviction for a crime committed in 1994 and that there was no new or recent information regarding involvement in crime to be considered. *See Exhibit A* Suppression Hearing Transcript (March 11, 2025) at 33-36.

Moreover, when Mr. Moore asked PO Festa about what was documented in his parole file it established that in the months preceding being placed on the G.I.V.E. Operation List, no parole warrants had been issued, he had been approved to travel out of state and PO Festa had indicated "no issues to report" in his notes after each home visit. *See Exhibit B* Suppression Hearing Transcript (March 21, 2025) at 212-214.

All testimony regarding the reason that Mr. Moore was placed on the list to be searched confirms that it was based solely on his conviction from 1996. His assigned parole officer clearly stated that there had been no reports whatsoever indicating that he was involved with drugs or guns or any other crime at the time he was placed on the list. The undisputed fact that parole had not received any complaints, reports, or tips alleging that the Defendant was involved with crime or that he was in criminal violation of his parole conditions leads to the conclusion that his placement on a list subjecting him to search by the Niagara Falls Police Department, the New York State Police, a K-9 Unit and an FBI agent, was unreasonable and therefore a violation of his Fourth Amendment rights. Mr. Moore objects to Judge McCarthy's failure to address or make a finding

regarding the illegality of Mr. Moore's placement on the list which unlawfully subjected him to a search by various law enforcement agencies.

B. **Objection to the Magistrate's Finding That New York State Parole's Seizure, Dissemination, and Use of Mr. Moore's Code to Enter the Building Was Lawful And "Furnishes No Basis for Suppression of Evidence"**

The record developed in this case clearly establishes that the recovery of the items that the Defendant seeks to suppress was made possible by and directly flows from the unlawful seizure and subsequent use of the Defendant's unique security key code. It is undisputed that Det. Travis gained access to the location where the items were found by entering through a third-floor apartment to reach the rear patio, which he could not have done without parole's exploitation of the illegally seized code to gain entry to the building. Det. Travis himself is on record admitting that he would not have been able to access the building (and therefore the recovered items) but for the assistance of parole with the code.

It must be noted that the Government has essentially stipulated to the fact that the Defendant did not provide his security key code to parole and that parole got the code from building management.

> **MS. DUNCAN**: Again, with the code seizure, the government doesn't dispute that the Defendant did not give his parole officer the code. To the extent that is the Defendant's concern, the government is not arguing with that. The government is fine conceding on the record that the Defendant did not personally give that exterior door code to parole.
>
> [Exhibit A - Suppression Hearing Transcript (March 11, 2025) at 4-5].

Likewise, parole officer Feta admitted that Mr. Moore was not required to provide parole with the code such that he was well within his rights to keep the security code private. His testimony was as follows:

> **DEFENDANT**: None of the conditions of my parole state that I was required to give you a key or code to enter my building, does it?
>
> **PAROLE OFFICER FESTA**. Not in the conditions, no.
>
> **DEFENDANT**: So, this is a preference more than an actual rule, right?
>
> **PAROLE OFFICER FESTA**: Yes, because a lot of times with apartment complexes if we're there for home visits, you're never going to hear us knocking from the bottom that is why we want access to get in to knock on the actual door.
>
> **DEFENDANT**: I understand the reasoning. I'm asking you a clear question. Is it a requirement of me to give you a key or code to the building to get into the apartment?
>
> **PAROLE OFFICER FESTA**: It's not part of our conditions, no.
>
> [Exhibit B - Suppression Hearing Transcript (March 21, 2025) at 199-200].

Mr. Moore clearly established that he was not required to give his building code to parole. The record further established that parole officer Festa had never taken any steps to circumvent Mr. Moore and request the code from building management until February 17, 2022, when the Niagara Falls Police Department, the New York State Police, and the FBI were conducting a task force operation focused on locating guns and evidence for future prosecutions.

> **DEFENDANT**: I lived there the entire time while you supervised me, right?
>
> **PAROLE OFFICER FESTA**: Yes.

> **DEFENDANT**: And you never had the code to get into the building until February 17th, correct?
>
> **PAROLE OFFICER FESTA**: Correct.
>
> **DEFENDANT**: Because I never gave it to you, right?
>
> **PAROLE OFFICER FESTA**: Correct.
>
> [Exhibit B - Suppression Hearing Transcript (March 21, 2025) at 199-200].

Detective Travis's testimony makes clear that he would typically have needed probable cause and/or a warrant to enter the building to conduct a search for guns, but in this case, he was able to gain entry to conduct the search with the assistance of parole. His testimony was as follows:

> **DEFENDANT**: Thank you. Same felony hearing, you also testified at my felony hearing that during the GIVE operation you are looking for people with guns so you can charge them accordingly?
>
> **MAGISTRATE JUDGE MCCARTHY**: Can you refer to page and line?
>
> **THE DEFENDANT**: Page 25, lines 3 through 6.
>
> **MAGISTRATE JUDGE MCCARTHY**: Okay.
>
> **DET. TRAVIS**: Okay, yes.
>
> **DEFENDANT**: You also admitted at my felony hearing that typically you would need probable cause to access my building, right, page 25 lines 10 through 14.
>
> **DET. TRAVIS**: Correct.
>
> **DEFENDANT**: Okay. So, there was no 911 call that night before you came to that a building, right?
>
> **DET. TRAVIS**: I don't believe so.
>
> **DEFENDANT**: No one came downstairs to let you in the building, right?

> **DET. TRAVIS**: Correct.
>
> **DEFENDANT**: You didn't have a search warrant for my apartment, did you?
>
> **DET. TRAVIS**: I did not.
>
> **DEFENDANT**: **So, if not for parole, you would not have been able to gain access to my building that night, right?**
>
> **DET. TRAVIS**: **Correct**.
>
> [Exhibit B - Suppression Hearing Transcript (March 21, 2025) at 154-156]

In his report and recommendation, Judge McCarthy finds that "[…] it was Moore's burden to demonstrate that PO Festa knew he was improperly obtaining Moore's private entrance code," however, he provided no legal support nor any case citations standing for the proposition that a Defendant must prove that an officer knew that his conduct was unlawful in order to seek suppression. Furthermore, he made no finding that the Government had met its burden to establish that the seizure was lawful.

Despite the assertion that Mr. Moore failed to demonstrate that PO Festa knew that his course of conduct was improper, the totality of the circumstances indicates otherwise. There is no dispute that Mr. Moore chose to exercise his right to keep his code to himself, in that he had previously declined to provide it to PO Festa. This alone would have alerted PO Festa that the information was private. There is no dispute that PO Festa had supervised Mr. Moore for months and conducted several home visits without incident and that prior to February 17, 2022, he had never taken any steps to obtain the code directly from the management company. It is indisputable that the only time he sought to get the code from the management company was when several law enforcement agencies were involved in an operation aimed at locating guns and gathering evidence

for future prosecutions. There is no dispute that after contacting the building and seizing the code, the previously private information was disseminated to and used by various law enforcement agents who conducted the search of the building.

Given the facts it is clear that PO Festa, a twenty-year veteran of New York State Parole, either knew or should have known that his seizure of the previously private code without a warrant and in the absence of consent, probable cause, or an emergency circumstance was improper. Surely, he would have known that disseminating the code to multiple law enforcement agents so that they could enter the location without a warrant and conduct a search related to finding guns was improper. Any suggestion to the contrary is simply not rooted in reality nor supported by the facts.

Given the facts and circumstances surrounding PO Festa's unauthorized seizure of the Defendant's personal security code in the absence of consent, probable cause, judicial oversight, or emergency, followed by the dissemination of that code to law enforcement officers whose stated objective was to find guns, it is clear that the seizure represents the type of violation of Fourth Amendment which taints everything flowing from it. As such, the items recovered from the three bags located on the rear patio of the building must be suppressed.

### C. Objections to the Magistrate's Finding That Probable Cause Existed to Arrest Mr. Moore and Search His Apartment.

As discussed above, Judge McCarthy's Report and Recommendation completely fails to address the initial lack of probable cause for law enforcement to enter the building and search the curtilage where the contraband was recovered at the rear patio of the building, while also claiming to consider the totality of the circumstances. The Report and Recommendation also misstates the

facts. It bases its finding that the arrest and search of Mr. Moore's apartment was lawful in part on the claim that "Detective Travis was told by his Lieutenant that someone had left **Moore's apartment** carrying bags…"

While Det. Travis testified almost three years after the fact that his Lieutenant told him that someone had exited the rear of an apartment "that we believed Austin was in," the Court had previously been provided transcripts memorializing the testimony of the NFPD officer who actually made the observation and testified about it just days after the incident. The Court was aware that the observing officer's previous testimony contradicts what Detective Travis testified to remembering three years later.

The prior testimony provided to the Court establishes that the observations that were made were completely benign and not at all indicative of criminal activity, such that they would warrant the initiation of a police investigation, a search or an arrest.

While the Government wrote in their response that law enforcement observed a black male "exit the Defendant's second floor apartment" that statement is misleading as no one has ever testified that they know which apartment the "black male" came from.

When Det. Travis was questioned about his personal observations and actions on cross examination, he admitted that he did not make any observations of the "black male" and he could not offer any first-hand testimony to establish which apartment the individual came from. *See Exhibit B* Suppression Hearing Transcript (March 21, 2025) at 160-162.

More importantly, PO Paul Warmington of the Niagara Falls Police Department was stationed at the rear of the building forming the perimeter and he made firsthand observations of the "black male" who exited the rear of the building. Officer Warmington previously testified under oath at the Defendant's felony hearing during the litigation of his state case and during that

testimony he conceded that he could not identify the Defendant as the person seen at the rear of the building nor could he identify the specific apartment that the black male exited. He further testified under oath in the state grand jury that based on what he actually observed, the bags could have just been trash that someone was putting out, indicating that his observation did not give rise to any inherent suggestion of crime or criminal activity. Officer Warmington's testimony at the Defendant's felony hearing was as follows:

> **ADA MALBRANCHE**: Thank you. So, the person that you saw come and go from the apartment, do you see that person in the Courtroom today?
>
> **POLICE OFFICER WARMINGTON**: **All I saw when I was in the rear was a black male. I'm not able to identify due to the distance**, it was dark out, it was raining.
>
> [Felony Hearing Transcript Admitted as Defendant's Exhibit B at 38].
>
> **ATTORNEY ALBERT**: All right. And you are there to provide security, why do you not ask him for his identification?
>
> **POLICE OFFICER WARMINGTON**: Due to the fact that I didn't know if that was a neighbor or who he was in the grand scheme of this stop.
>
> [Felony Hearing Transcript Admitted as Defendant's Exhibit B at 41-43].

In the state grand jury, Officer Warmington specified that he did not immediately take action with regard to his observation of what appeared to be a black male at the rear of the building because he did not know if it was the "target" and the person could have just been taking out the trash.

> **ADA STOELTING**: Once you made that observation, did you notify anyone of that?

> **POLICE OFFICER WARMINGTON**: Not right away because like I said, **I didn't know if it was the target, didn't know who it was. For all I know it could be where people on that side toss garbage** and he was just running garbage up. Didn't know what their role was.
>
> [See Dkt. #37 Exhibit F (State Grand Jury Transcript), at 45-46].

In repeatedly stating under oath that he could not identify the individual observed at the rear of the building, that the person could have been a neighbor, and that he did not see anything that was inherently indicative of crime, Officer Warmington is essentially conceding that there was no probable cause for law enforcement to proceed with conducting an investigation, a search or an arrest. Since there was no probable cause to suspect that the bags in question were criminal in nature, law enforcement's seizure and subsequent search of said bags was unlawful.

In finding that the search and arrest of Mr. Moore was lawful, the Magistrate is ruling that probable cause exists where the observing officer is on the record admitting that he cannot identify Mr. Moore, he only saw a "black male," he did not know what was in the bags, he did not take any further action because the person could have just been taking out the trash, and he did not know if the person was the "target" or someone from a neighboring apartment. Concluding that there is probable cause to search and arrest exists where there are so many documented unknowns is highly problematic. The totality of the circumstances here indicate that officers took action based on the antithesis of probable cause; speculation, conjecture, assumption, and guesstimation.

Given that there is nothing in the record to credibly indicate that on the night in question, there was probable cause to believe that Mr. Moore was the individual at the rear of the building or that the bags carried by the individual were criminal in nature, the search of the curtilage of the building as well as the interior of Mr. Moore's apartment was not based on probable cause. Mr.

Moore was searched and arrested by Niagara Falls Police Department without a warrant and without probable cause such that all items recovered from the curtilage of the building and from inside the apartment must be suppressed.

**D. Objection to the Magistrate Judge's Finding that Mr. Moore Was Not Pressured or Misled into Participating in a Custodial Interview**.

Mr. Moore testified that after being arrested, he was taken out of his holding cell at the Niagara Falls Police Department by FBI Agent Middlebrooks and placed in a small room with no windows. He further indicated that he immediately stated that he wanted a lawyer, but Agent Middlebrooks continued to urge him to consent to an interview despite his request for a lawyer. Mr. Moore explained that he ultimately relented and agreed to have a conversation with Agent Middlebrooks because it was clear that he was not accepting "no" for an answer and because Agent Middlebrooks represented to him that the conversation was not about his current arrest. Agent Middlebrooks further indicated that a lawyer was not necessary because the conversation would remain completely confidential or "off the books".

The Defendant believed Agent Middlebrooks' representations, specifically his promise of confidentiality because the conversation was not being recorded, and based on his previous experience with police, he knew that Defendant's "statements" with police are memorialized. Believing Agent Middlebrooks' promise of confidentiality as well as his insistence that the Miranda form was just a formality since the conversation was confidential, he ultimately signed the waiver form.

The Defendant also explained that once he was provided with a copy of Agent Middlebrooks' report (which did not occur until October of 2024) he observed that it included

various statements that he himself had never made, as well as facts that he did not personally know, as if Agent Middlebrooks had conducted some investigation and included his own observations/findings in the report.

Furthermore, the fact that the report that Agent Middlebrooks drafted which the Government is attempting to attribute to the Defendant is labeled "CONFIDENTIAL" at the top of the page seems to corroborate the Defendant's claim that he was promised that their conversation would remain confidential. Notably, although the so called "statement" took place on February 17, 2022, it was never mentioned nor provided to the state prosecutor nor to Mr. Moore until October of 2024 when her case was crumbling, almost as if it were being kept confidential.

When asked about why the conversation was not recorded or memorialized in any way like an actual statement that is intended to be used against someone would be, Agent Middlebrooks' explanation is utterly unpersuasive. He insinuates that it would have been too much of a hassle or inconvenience to get on the elevator and go up one floor to the recording room. See Suppression Hearing Transcript (March 11, 2025) at 94-96].

The fact that Agent Middlebrooks elected not to take the Defendant one flight up to the recording room where the so called "statement" could be memorialized, corroborates the Defendant's claim that he was told it was an "off the books" conversation that would remain confidential.

The Defendant eventually agreed to sign the Miranda Waiver and engage in what he believed to be a confidential conversation with Agent Middlebrooks relying on Middlebrooks' false promise of confidentiality as well as his false representation that signing the document was a mere formality because an attorney was not needed for an "off the record" conversation.

Given the deliberate tactics employed by Agent Middlebrooks, the Defendant's waiver of Miranda rights was not voluntary as his resolve was weakened and ultimately overtaken by the stress of the situation combined with the strategy of Agent Middlebrooks. As such, the "statement" was the product of Agent Middlebrooks' deception and duress as opposed to the Defendant's free will or informed voluntary choice.

The Defendant relied on the false promises and representations of Agent Middlebrooks, and but for those representations in conjunction with the stress of the situation, he would not have signed the waiver nor spoken to Agent Middlebrooks, therefore the "statement" must be suppressed. United States v. Shvartsman, 722 F. Supp. 3d 276 (S.D.N.Y. 2024) (stating that where a law enforcement officer's deception is linked up to the constitutional standard of threat or promise it may render a statement involuntary and therefore subject to suppression due to violation of the 5th Amendment right against self-incrimination); see United States v. Male Juv. (95-CR-1074), 121 F.3d 34 (2d Cir. 1997) (stating that in order to be considered voluntary an accused's relinquishment of Miranda rights must be the product of a free and deliberate choice rather than intimidation, coercion, or deception).

In addition to the fact that the Defendant's so-called statement was involuntarily made, the fact that Agent Middlebrooks clearly added information to his report that did not come from his conversation with the Defendant is highly problematic and should preclude the use of the material whether the statement was voluntary or not. It also calls into question Agent Middlebrooks' credibility.

On cross examination the Defendant attempted to ascertain where some of the information included in the report originated from, and the Court also inquired about the source of certain information that has been attributed to the Defendant, but Agent Middlebrooks dodged the question

and provided answers that were evasive (to put it politely). See Suppression Hearing Transcript (March 11, 2025) at 117-119.

Mr. Moore inquired about where a specific piece of information that is included in the Agent's report (but not in his handwritten scratch notes) came from. Agent Middlebrooks concedes that the information is not reflected in his handwritten notes but somehow it is included in his typed report that the Government is attempting to attribute to the Defendant. When asked by the Court if the information originated from some other source, instead of giving a straightforward "yes" or "no" answer, Agent Middlebrooks evades the question and says, "I don't know that I would say that is accurate."

This response does not answer the question and more importantly it supports the Defendant's assertion that the information did not come from him. If this one piece of information was added to the report from another source and then put forward as if it were stated by the Defendant, what else in the report originates from another source? Moreover, how can any report that clearly contains information not supplied by the Defendant be offered by the Government and accepted by the Court as the Defendant's "statement," especially when it has never been adopted, approved, acknowledged, or signed by the Defendant?

In light of the involuntariness of the "statement" coupled with the fact that it was made without legal representation present, and it apparently contains information that did not originate from the Defendant, the report drafted by Agent Middlebrooks must be suppressed and/or precluded from use at trial.

**E. Objection to the Magistrate Judge's Finding that the Government's Delay in Filing Charges Does Not Warrant Dismissal Pursuant to Rule 48(b)**

Mr. Moore objects to the Magistrate Judge's determination that he was not prejudiced by the government's pre indictment delay as well as its determination that said delay was not designed to serve an improper purpose. The government's choice to delay filing charges for approximately 33 months while he was detained and being prosecuted by New York State has severely prejudiced him. Mr. Moore asserts that this lengthy delay has resulted in some loss of memory regarding the incident in question. Given that he is entitled to assist in his own defense and testify at trial should he so choose, the government's choice to delay for such a lengthy period of time diminishes his ability to mount an effective defense. Moreover Mr. Moore's assessment of his own ability to recall the events of February 17, 2022 is not speculative.

Furthermore, the fact that the governments witnesses when testifying during the pre-trial hearing often indicated that they could not remember specific facts about the date in question or their prior testimony from 2022 also indicates that the delay has had a negative effect on their recollection as well. This too is not speculation given that it is documented in the pretrial hearing transcript.

Additionally, Mr. Moore has been detained for an excessive period of time during which he has suffered a multitude of medical conditions that have also at times inhibited his ability to meaningfully participate in his own defense.

The government's 33-month delay in filing federal charges is exceptionally dubious in light of the fact that the federal government was involved in the arrest. It is indisputable that federal Agent Middlebrooks was on the scene on the night of the incident such that the federal government was fully aware of the arrest and completely capable of filing federal charges in February of 2022.

Instead, the decision was made to decline federal prosecution in favor of the state moving forward with the case.

Mr. Moore was detained and litigating the case in state court for almost three years, up to the point of jury selection. In the days immediately preceding the scheduled trial the state prosecutor repeatedly approached Mr. Moore’s defense attorney, pressing for a plea to resolve the case. In October of 2024, when Mr. Moore repeatedly declined to enter a plea and insisted on having a jury trial, the state prosecutor informed Mr. Moore’s counsel that if he did not take a plea, federal charges may be filed. Mr. Moore still insisted on moving forward to trial as he was confident that he would win, and even if he lost, he would retain his right to appellate review.

On the morning of jury selection when there was no longer any possibility of a plea, the state prosecutor dismissed the state charges representing to the Court that the federal prosecutor wanted to take over the prosecution.

In his report and recommendation Judge McCarthy indicates that the federal prosecutor had made an “independent” decision to pursue federal charges. R&R Dkt #139 at 8. The characterization of the federal prosecutor’s decision to file charges as being ‘independent” is flawed. It is memorialized in the record that the federal government was contacted by the state prosecutor requesting that the US attorney's Office take the case. This was admitted on the record by AUSA Duncan herself. On October 29, 2024, at Mr. Moore’s original detention hearing when asked by the Court why the federal government was pursuing these charges almost 3 years after the fact, AUSA Duncan honestly admitted on the record that “The district attorney's office reached out to Mr. Joel Violanti, and I don't know exactly how far back their conversations went, but I don't believe it was very long. He then directed me to file the Complaint.” Dkt #16 at 12. This confirms the fact that the federal government had no “independent” interest in filing charges against the

Defendant and that their delayed involvement developed at the insistence of the state prosecutor and for her benefit.

The federal government's delayed filing of charges created a tactical advantage over the Defendant in that it deprived him of proceeding with a state trial that he had been waiting for while detained for approximately 33 months. It further deprived him of access to appellate review of all of the prosecutorial misconduct that had occurred on the state level. Furthermore, given that he had already been worn down (mentally, physically and financially) by almost three years of pre-trial detention and litigation when the federal government restarted the process from the beginning, it placed the Defendant under extreme duress and gave the federal government a tactical advantage.

**F. Objection to the Magistrate's Recommendation that Count 3 of the Indictment Not be Dismissed.**

Mr. Moore maintains that there are no specific facts that create a nexus between the firearms and furtherance of drug trafficking activity. There is no credible evidence that the Defendant sold drugs to anyone. There is no testimony on the record indicating that the Defendant was observed in any kind of hand-to-hand transactions and the extensive search of his apartment dd not result in the recovery of any pre-recorded buy money, other large sums of cash, or drug residue indicative of the packaging or trafficking of drugs.

The government relies solely on the fact that the bags recovered on the rear patio were found to have guns and drugs in close proximity to one another. However, the items were in separate bags and according to the government, they had just been placed there.

**G. Objection to the magistrate's Recommendation that the Court Deny His Motion for Dismissal due to Outrageous Conduct/Vindictive Prosecution**

**Excessive Hearsay**

While the Second Circuit continues to permit the submission of hearsay to the grand jury, the have also consistently warned of the dangers associated with over reliance on hearsay. See United States v. Brito, 907 F2d. 392 (2d Cir. 1990) (Opining that "As we see it, there is a great deal to criticize in the government's handling of this grand jury proceeding. The single-witness policy routinely relies on hearsay, producing "'evidence' which appears smooth, well integrated and consistent," making even weak cases appear strong). While technically permitted, Mr. Moore objects to the extensive use in his case because given the Government's delay in filing charges, it shielded witnesses who otherwise would have testified from being challenged on their memory of events.

**Leading Questions**

Mr. Moore objects to the Magistrate Judge's finding that the excessive use of leading questions in the grand jury was permissible. When one considers that there was excessive hearsay combined with leading questions, it is clear that the function of the grand jury is negatively affected when the prosecutor is permitted to essentially testify by way of successive leading questions that are also then answered by a hearsay witness. This exerts undue influence on the grand jurors thereby degrading their independence and violating Mr. Moore' right to due process.

**Inaccurate/Misleading Testimony**

Mr. Moore objects to the finding that the inaccurate information regarding the DNA testing represented a "harmless error". In being told that the DNA testing was conducted by the Erie County Central Police Services Forensic Library when it was actually conducted by the Niagara County Forensic Lab represented a material misrepresentation. Had the grand jurors been told that the testing was conducted by a lab that was widely reported to be under investigation by the State Commission on Forensic Science for various violations including fabricating documentation, the grand jurors may have valued the report differently or had additional questions about the testing. The Magistrate Judge found that since the signature block on the DNA report indicates that the forensic criminalist works in Niagara County deems the error harmless. However, the prosecutor had an obligation to correctly present the information or correct any errors prior to voting. To hold the grand jurors responsible for sifting through the documents to discover the inaccuracy in the signature block is unreasonable.

Given the questions that jurors may have had about why the testing was done in Erie County for a Niagara County Case or the possible questions based on the media coverage of the failures of the Niagara County Forensics lab and/or the lack of credibility that the report otherwise may have had, this erroneous representation was harmful in that it interfered with the independence of the grand jury.

**Presentation of Prejudicial Information**

Mr. Moore objects to the Magistrate Judge's finding that the presentation of his criminal history including his sentence and parole term had a legitimate purpose and was not prejudicial.

While the Government were required to provide proof that Mr. Moore had a previous felony conviction as an element of Count II of the complaint and Count 4 of the indictment, that could have been accomplished without also divulging his conviction, the length of his sentence (18-life), or the fact that he was on parole for life. There was no legitimate reason for the Government to elicit the Defendant's sentence or his length of parole from the witness.

In addition to the inflammatory information regarding the Defendant's criminal history, the prosecutor also offered misleading and prejudicial information included in the statement of NFPD Det. Rashad Travis that was read into the record by Agent Middlebrooks. The Magistrate completely ignored the presentation of this inflammatory information to the grand jury in that it is not addressed in his Report & Recommendation although the issue was raised by Mr. Moore in his pre-trial motion. In the statement that was read Det. Travis writes in sum and substance that he had previously been to the Defendant's apartment in the past in connection to a drug overdose "involving the Defendant". This portion of the statement was highly prejudicial, not probative of any fact to be proven, and it was extremely misleading as it provides no context and encourages improper inferences.

The statement is worded as if to suggest that the Defendant was a suspect or a party to a drug deal that resulted in death or something of that nature which is highly problematic as the Defendant is accused of possessing narcotics in this case. That statement should have been redacted given its susceptibility to misinterpretation and negative inference. This is especially the case when it is known that when the prior overdose incident occurred, the victim was the leaseholder of the premises from whom the Defendant rented a room, as it was difficult to find housing upon his release from prison.

At that time the overdose victim was found in her room and the incident was determined to be accidental. Furthermore Mr. Moore was never questioned by law enforcement, there was never an investigation, he never spoke with Det. Travis about the incident, there were no arrests, or criminal charges for anyone. So, to present to the grand jury in a case seeking charges for narcotics possession that there was a prior drug overdose at the location that "involved the Defendant" was unnecessary, misleading, and intended to prejudice the jurors such that it served only to interfere with the grand jury's independence and violated Mr. Moore's right to due process.

**Scientific Evidence Presented by Unqualified Witness**

Mr. Moore objects to the presentation of scientific evidence by FBI Agent Middlebrooks who himself admitted during the grand jury presentation that he was "not even close" to being a forensic biologist. DNA testing is highly technical, especially in Mr. Moore's case, where the samples tested are comprised of three separate DNA profiles and where he was excluded as a contributor in one of the two samples tested.

FBI Agent Middlebrooks was unqualified to explain what the conclusions in the report mean or how they were reached. Similarly, he would be unqualified to answer any questions that may have been asked by the grand jurors.

## H. Objection to the Magistrate Judge's Recommendation That Mr. Moore's Request for Inspection of the Grand Jury Minutes Should Be Denied

Given that it has been shown that the grand jury presentation was full of excessive leading questions, hearsay testimony, prejudicial information about Mr. Moore's past that had no bearing on any element of the crimes charged, inaccuracies regarding the DNA testing, and testimony from

an unqualified witness pertaining to DNA evidence, Mr. Moore's request for inspection is reasonable. Specifically, in light of the overindulgence in questionable choices that in the aggregate likely resulted in undue influence on the grand jury. Mr. Moore requested the Court to inspect the jury instructions to ensure that the grand jurors were appropriately informed and that any questions were properly answered.

**I. Motion for Brady and Giglio Material**

Mr. Moore objects to the Magistrate Judge's denial of his motion for Brady and Giglio materials. Mr. Moore filed two separate requests for sanctions regarding the violation of Brady. To date these motions are still pending and have never been fully heard or ruled upon. So, the Magistrate Judge's assertion that he has no reason to doubt that the government will fully comply with its Brady and Giglio obligations is flawed given that Mr. Moore maintains that there are currently outstanding disclosures that should have been made.

In the middle of his cross examination of Parole Offier Cathy Scarupa during the evidentiary hearing on March 11, 2025, the government's witness admitted that she had written notes regarding this incident that were uploaded to the Department of Parole system but never been turned over. *See* Suppression Hearing Transcript [March 11, 2025] at 41-42.

Immediately, Mr. Moore requested a copy of the notes and asked the Court to order that they be provided. The court indicated that the issue would be handled at a later time, however these notes, which were critical for addressing credibility issues, were not then, and still to this day have not been turned over to the defense.

Additionally, paperwork regarding the purchase of the firearms in question and the identity of the purchaser have not been turned over to the defense. The Government's failure to provide

requested documents prevented Mr. Moore from his continued cross examination which violated his right to due process.

The Defendant was further prejudiced by the fact that the pre-trial hearing was closed before the material was ever provided thereby preventing Mr. Moore from examining and/or using it in his defense which is a clear violation of Title 18 U.S.C 3500 which can only be cured by dismissal.

Lastly, Mr. Moore also filed a motion requesting authorization for defense expenditures, specifically for costs of a DNA expert to provide an independent opinion as to the protocols and procedures used by the testing lab, the quality of the sample tested, and the accuracy of the conclusions reached by the government's witness. The Magistrate Judge made no recommendation on this issue, so Mr. Moore hereby renews his request

**WHEREFORE** Mr. Moore asks that the R&R of the Magistrate Judge not be adopted, that said indictment be dismissed, and that the recovered evidence be suppressed in accordance with the Law.

Dated: November 11, 2025

*<u>/s/ Paul Michalek Jr.</u>*

Paul Michalek Jr.
Attorney for Defendant
300 Center Road
West Seneca, NY 14224
(716) 675-6715